Olivia Glasscock
Katharine S. Glover
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: oglasscock@earthjustice.org
E: kglover@earthjustice.org

Ashley Donovan
EARTHJUSTICE
310 K Street Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: adonovan@earthjustice.org

*Attorneys for Plaintiffs Ketchikan Indian Community, Center for Biological Diversity, and Southeast Alaska Conservation Council*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| KETCHIKAN INDIAN COMMUNITY, CENTER FOR BIOLOGICAL DIVERSITY, and SOUTHEAST ALASKA CONSERVATION COUNCIL,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; JEREMIAH C. INGERSOLL, in his official capacity as United States Forest Service Region 10 Acting Regional Forester, and JANELLE CROCKER; in her official capacity as Acting Forest Supervisor for the Tongass National Forest,<br><br>*Defendants*. | ) | Case No. 1:26-cv-00017 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 701-06; 16 U.S.C. §§ 529-31; 16 U.S.C. § 1604; 16 U.S.C. § 3120)**

## INTRODUCTION

1. The U.S. Forest Service (Forest Service) authorized extensive logging across thousands of acres, the majority old growth, in the Tongass National Forest (Tongass) on Revillagigedo Island near Ketchikan, as part of the South Revillagigedo Integrated Resource Project (the "South Revilla Project" or Project). This authorization is arbitrary and capricious; violates the National Forest Management Act (NFMA) and the Multiple Use and Sustained Yield Act (MUSYA) because the Forest Service failed to rationally balance the Tongass's multiple uses; violates the Alaska National Interest Lands Conservation Act (ANILCA) because the agency irrationally concluded that the Project's significant restriction on subsistence is necessary and uses the minimum amount of public lands; and violates NFMA because the agency irrationally concluded that the Project preserves sufficient habitat to support a viable, well-distributed population of Queen Charlotte goshawks.

2. The South Revilla Project authorizes extensive logging and road building through crucial wildlife habitat and key subsistence use areas over the next 15 years. One of the Project's three stated purposes is to contribute to jobs and economic opportunities through timber, recreation, and resource management. The Project authorizes logging of up to 83 million board feet (MMBF) of trees, the majority old growth. The Forest Service has not indicated how many timber sales it plans to hold, the volume of logging offered in each sale, when it intends to hold sales, or the location of the offerings. In addition, the Forest Service approved the construction of 11.1 miles of new road and 30.9

miles of temporary roads, and the reopening of 31.9 miles of existing closed roads, to facilitate logging.

3. While the Final Environmental Impact Statement (FEIS) and Record of Decision (ROD) generally authorize logging in units spread throughout the Project area's 41,305 acres, the Forest Service's analysis shows that logging the entire Project would result in negatively appraised timber sales, which the Forest Service is prohibited by law from advertising. Thus, the Forest Service is unlikely to—and currently cannot—offer the whole Project as described in the FEIS.

4. Instead, the Forest Service claims it will later come up with sale configurations that will appraise positively, but it has not explained the choices it will make to achieve positively appraising sales. The Forest Service has failed to describe how such sales would affect the Project's benefits and harms to subsistence, wildlife, recreation, and other forest uses. The Forest Service does not plan to conduct a National Environmental Policy Act (NEPA) analysis or make subsistence findings for subsequent timber sales implementing the Project.

5. Because it has not analyzed these choices, the Forest Service has not rationally balanced the forest's multiple uses as required by NFMA and MUSYA nor shown that projected restrictions to subsistence uses of the area are necessary and will use the minimum lands necessary as required by ANILCA.

6. Further, the Project authorizes clearcut logging of old-growth forest, which is essential habitat for Queen Charlotte goshawk, a subspecies of the northern goshawk endemic to the Tongass and part of Canada.

7. Experts, including within the Forest Service, have shown that the Forest Service's old growth habitat conservation strategy ("Conservation Strategy")—a strategy intended to maintain viability of old-growth dependent species across the Tongass—is inconsistent with goshawks' biological requirements and does not preserve sufficient habitat to support well-distributed, viable goshawk populations, as required by the Tongass Land and Resource Management Plan (TLMP) and NFMA. Instead of providing the necessary amount of habitat according to the best available science, the Forest Service authorizes clearcut logging in an area with known, probable, and historical goshawk nests.

8. Within the Project area, the forest has already been subject to extensive old-growth logging and road building. Protecting the remaining old-growth habitat within the Project area is especially crucial because the area remains important for wildlife and subsistence. Large-scale logging and extensive road building reduce habitat capability for Sitka black-tailed deer, Queen Charlotte goshawk, and other species that rely on the intact, old-growth ecosystem. These activities also significantly restrict the abundance of subsistence resources and opportunities for subsistence hunting of deer.

9. The Project will harm important forest uses and values, particularly subsistence, wildlife, and recreation, by authorizing logging of old-growth trees within the Project area. The Project will irreparably harm the forest ecosystem and Southeast Alaska residents who depend on the forest for subsistence, recreation, and other uses.

10. Plaintiffs include an Alaska Native Tribe and nonprofit environmental organizations, all of whom depend on and advocate for an intact and healthy Tongass ecosystem, including the South Revilla Project area. They seek declaratory and injunctive relief to hold unlawful and set aside the South Revilla Project FEIS and ROD.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (civil actions against the United States), and 1362 (civil actions by federally recognized tribes).

12. This Court may issue a declaratory judgment and grant further relief pursuant to 28 U.S.C. §§ 2201-02. Judicial review, vacatur, and injunctive relief are available under the Administrative Procedure Act. 5 U.S.C. §§ 701-06.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

### Plaintiffs

14. Plaintiff Ketchikan Indian Community is a sovereign Tribal government and federally recognized Tribal government, organized under the Indian Reorganization Act in 1940. It is one of the largest Tribes in Southeast Alaska, representing more than

6,600 citizens, who are primarily of Tlingit, Haida, and Tsimshian lineages. Ketchikan Indian Community upholds their peoples' traditional Way of Life and the ancient and sacred values of their ancestors. A cornerstone of this mission is to ensure Tribal citizens can hunt, fish, and harvest the nutritious food of the region and access old-growth and cultural trees for customary and traditional uses, that are intrinsically interwoven with and indispensable to the Tribe's way of life and sovereign interests. Tribal citizens use traditional areas for hunting, fishing, and gathering with specific traits of traditional ecological knowledge to live and revitalize culture, such as through canoe making, medicinal gathering, and stewarding knowledge through ecological immersion, including in the South Revilla Project area. Deer in the Project area are especially important to Tribal citizens and in past years have comprised most of the deer the community harvested. The Tribe places the highest importance on practicing traditional and customary uses of its ancestral lands. In service of that goal, for example, the Tribe successfully proposed that the Federal Subsistence Board reclassify Ketchikan as a rural community in 2025, gaining priority status for subsistence under ANILCA. Ketchikan Indian Community's interests in subsistence practices within the Tongass are deep and tied to reconnecting the use of the land with traditional ways of life. These interests extend to the knowledge, resources, and practices within the Project area that the Tribe has a stake in protecting, stewarding, and educating on. Citizens use old-growth trees for traditional cultural practices, such as totem carving, basket weaving, and other traditional

arts and crafts. Ketchikan Indian Community strives to protect these natural resources and fulfill its duty as stewards of the earth, water, and air, as has been practiced since time immemorial. Ketchikan Indian Community's mission includes stewarding, conserving, preserving, enhancing, and protecting places and customs that are of significant historical, cultural, and environmental importance by using traditional ecological and cultural knowledge and science. Though it was hampered by the process the Forest Service imposed, Ketchikan Indian Community served as a cooperating agency during the NEPA process for the Project. Ketchikan Indian Community participated in the public meetings held in Ketchikan and attempted to hold meaningful Government-to-Government consultation with the Forest Service.

15. Center for Biological Diversity ("the Center") is a national non-profit organization, with offices across the country and in Alaska. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has about 101,000 active members, including 483 in Alaska. The Center's members and staff use and enjoy the Tongass, including the South Revilla Project area, for recreation, research, photography, wildlife viewing, and more. The Center is actively involved in species and habitat protection issues throughout the United States. Regarding the Tongass National Forest, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the Endangered Species Act. The Center carefully follows the

fate of these and many other species that depend upon the Tongass's wildlands. The Center has long advocated for protection of old-growth stands in the Tongass not only for their value as wildlife refugia but for their carbon storage, a key element in limiting the worst impacts of the ongoing climate crisis. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are intricately linked.

16. Southeast Alaska Conservation Council (SEACC) is a non-profit, member-based organization, with thousands of supporters and members, a majority of whom are Alaskans. These members and supporters use and enjoy the South Revilla Project area for recreational, commercial, and traditional and cultural purposes. SEACC's mission is to protect the special places of the world's largest temperate rainforest, promote conservation, and advocate for sustainability in human use of natural resources. Inspired by the land, wildlife, cultures, and communities of Southeast Alaska, SEACC strives to ensure this interconnected whole exists for future generations. To achieve its mission, SEACC and its members have worked to protect the Tongass National Forest, and advocated for balanced, sustainable use of the Tongass National Forest's renewable forest resources, including fish and wildlife, and the commercial, recreational, and subsistence use of such resources for 50 years.

17. Plaintiffs' citizens and members reside near, visit, or otherwise use and enjoy the South Revilla Project area. Plaintiffs include an Alaska Native Tribe whose

citizens have lived in and depended on the Tongass for thousands of years and who continue to depend on the forest, including within the Project area, to support their ways of life and traditional and cultural practices. Plaintiffs' citizens and members use land throughout the Project area for subsistence, sport hunting and fishing, recreation, wildlife viewing, photography, education, and aesthetic and spiritual enjoyment. Plaintiffs and their citizens and members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from their use of the area. The logging and roadbuilding authorized in the South Revilla FEIS and ROD will directly and irreparably injure these interests by destroying and degrading habitat, reducing wildlife abundance, restricting subsistence, and interfering with other forest uses.

18. Plaintiffs monitor the use of forest ecosystems and compliance with the laws respecting these ecosystems; educate their citizens, members, and the public concerning management of these ecosystems; and advocate for policies and practices that conserve the natural value of these ecosystems. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law. The interests and organizational purposes of Plaintiffs are directly and irreparably injured by Defendants' violations of the laws as described in this complaint.

19. Plaintiffs participate actively in the administrative processes established for management of the Tongass and did so for the South Revilla Project. Plaintiffs submitted

comments on scoping and the Draft Environmental Impact Statement (DEIS) for the Project. Plaintiffs also filed objections to the draft ROD, pursuant to Forest Service regulations. Plaintiffs have exhausted administrative remedies for the decision challenged in this complaint. Plaintiffs seek declaratory and injunctive relief preventing the Forest Service from proceeding with unlawful actions that cause harm to the environment and to subsistence uses, and thereby to their citizens and members, pending compliance with the law.

**Defendants**

20. The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service. It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass National Forest. It was the lead agency responsible for preparing the FEIS.

21. Defendant United States Department of Agriculture is the department of the executive branch responsible for overseeing the activities of the Forest Service.

22. Defendant Jeremiah C. Ingersoll is sued in his official capacity as Acting Regional Forester for Region 10 of the Forest Service. Ingersoll was the decision-maker on the objections to the draft ROD for the South Revilla Project.

23. Defendant Janelle Crocker is sued in her official capacity as Acting Forest Supervisor for the Tongass National Forest. Crocker is the responsible official and signed the ROD.

## FACTS

### The Tongass National Forest

24. The Tongass National Forest, at nearly 17 million acres, is the world's largest old-growth temperate rainforest and this country's largest national forest. The Tongass contains nearly a third of all old-growth temperate rainforests left in the world.

25. The Tongass is the traditional homeland of the Tlingit, Haida, and Tsimshian peoples, who have inhabited the land since time immemorial. The Tongass sustains these Indigenous peoples' subsistence way of life.

26. In the Tongass, towering stands of ancient Sitka spruce, western hemlock, red and yellow cedar, and other tree species provide habitat for hundreds of wildlife species, support communities of Indigenous people as they have for thousands of years, and store millions of metric tons of carbon dioxide.

27. Trees on the Tongass can grow to 200 feet tall and live for over 800 years. Old-growth stands provide the highest quality habitat and take centuries to mature, making them effectively non-renewable, irreplaceable resources. These trees, their roots, and the soil function as carbon sponges, absorbing and storing 20 percent of all carbon stored in the National Forest System, serving as a critical resource in the fight against climate change.

28. The Tongass provides vital habitat for diverse wildlife, including Queen Charlotte goshawks, Sitka black-tailed deer, Alexander Archipelago wolves, black bears, and small endemic mammals.

29. The Queen Charlotte goshawk evolved to live in the Tongass's old growth. They avoid clearcut areas and young-growth stands. Nesting pairs are territorial with territories averaging between 10,000 and 25,000 acres. An individual goshawk's breeding home range averages 21 square kilometers, and breeding pairs' combined home ranges can be much larger. Because they require large territories, habitat destruction and fragmentation impact their mortality and nesting success, affecting goshawks at the population level.

30. Sitka black-tailed deer, a unique subspecies of mule deer and important subsistence resource, depend on old-growth stands for food and winter habitat. Dense old-growth canopies shelter the forest floor from deep snow, leaving the underbrush exposed for deer to forage. Access to high value winter habitat is the most important factor influencing the deer population.

31. Clearcut logging of old-growth forest destroys and fragments important habitat for these species, and young-growth stands do not provide the same high-quality habitat. Roads also fragment habitat, interfere with fish passage, and increase access for hunters and trappers. Logging and infrastructure development also degrade watersheds and diminish ecological integrity.

32. Deer populations on the Tongass are expected to decline as additional areas are clearcut and previously clearcut areas mature into young-growth stands, making conservation of remaining old growth ever more important. Reductions in deer

populations harm subsistence users by reducing the abundance of subsistence resources and increasing competition.

33. Salmon provides nitrogen for the forest, food for wildlife, and catch for subsistence and commercial fisheries. Thousands of acres of streams, lakes, and ponds in the Tongass provide habitat for all five species of Pacific salmon, producing about 64 million fish annually.

34. Salmon are essential to the subsistence way of life, and subsistence users caught an average of over 55,000 salmon in Southeast Alaska per year between 2007 and 2016.

35. Tongass waterways produce about 22 percent of Alaska's annual commercial salmon catch and 75 percent of Southeast Alaska's annual commercial salmon catch.

36. Sport, commercial, and subsistence fishing in Southeast Alaska contributes $1 billion annually to the regional economy and accounts for 7 percent of the region's employment.

37. The Tongass's iconic wildlife and spectacular scenery draw over 1.6 million cruise passengers each year, contributing an additional $1 billion to the Southeast Alaska economy and approximately 18 percent of its jobs.

38. By contrast, logging represents less than 1 percent of employment in the region, or 274 jobs.

39. Tourism and commercial fishing are important sectors of the economy that rely on the Tongass's healthy watersheds, remaining intact ecosystems, and natural scenic beauty. Extensive clearcut logging threatens those values.

**The South Revilla Project Area**

40. The South Revilla Project area encompasses 41,305 acres of the Tongass on Revillagigedo Island just 17 miles northeast of Ketchikan.

41. The Project area contains important habitat for old-growth dependent species and subsistence resources. In particular, the Sitka black-tailed deer, the Queen Charlotte goshawk, and the endemic Revillagigedo Island southern red-backed vole occur throughout the Project area.

42. The Project area covers 29 watersheds, including 139 miles of anadromous fish habitat. Coho, pink, chum, and sockeye salmon and other fish species occur in the Project area's freshwaters. The Project area's watersheds are affected by an existing 188 miles of roads, with 103 fish crossings, 38 of which pose barriers to fish passage.

43. Large portions of the Project area have already been devastated by decades of industrial clearcut logging. However, old-growth stands do remain, providing vital habitat for wildlife.

44. Three communities, Ketchikan, Metlakatla, and Saxman, use the Project area for subsistence activities. Many residents, including citizens of the Ketchikan Indian Community, depend heavily on subsistence hunting and fishing, including in the Project area, to meet their needs. Subsistence users harvest fish, deer, berries, cedar bark, and

other subsistence resources. Tribal citizens harvest old-growth trees, including yellow-cedar, for traditional cultural practices, including totem carving and basket weaving.

45. The Forest Service notes that current subsistence-use information is lacking. For instance, no agency has conducted a comprehensive household harvest survey to catalogue Ketchikan residents' subsistence use.

46. However, the Ketchikan Indian Community conducted its own survey, and the Forest Service relied on this survey in the FEIS.

47. Regarding Metlakatla and Saxman, the Forest Service acknowledges that data needs to be updated because significant time has passed since the previous surveys to catalogue these communities' subsistence use.

48. Salmon and deer are important subsistence resources for all three communities. In 2017, sockeye salmon made up 79 percent of the harvest for the area's subsistence fishery, which includes Ketchikan, Metlakatla, and Saxman. Additionally, between 2011 and 2018, deer harvest and the estimated number of hunters within the Project area increased. All three communities are expected to have increased subsistence use of the Project area, since the Ketchikan-Shelter Cove Road, which connects Ketchikan to the Shelter Cove recreation area within the Project area, was completed in 2025.

49. Ketchikan residents harvest an average of 90 pounds of wild resources per person, per year, and deer account for an estimated 12 percent of those harvested

resources. Ketchikan residents historically harvested much of their deer from within the Project area—70 percent in 2011. In 2018, 44 percent of the deer harvested by Ketchikan hunters came from the Project area. Ketchikan residents harvested 70 pounds of fish and marine invertebrates per person in 2006, accounting for 78 percent of total harvest.

50. In 1987, Metlakatla residents harvested an average of 11 pounds of deer per person annually, including from within the Project area, which amounted to 15 percent of total harvested resources. Metlakatla residents harvested 55 pounds of fish and marine invertebrates per person, 78 percent of the total harvest.

51. For Saxman residents, deer amounted to 13 percent of the total harvest, and previous data suggests that 75 percent of those deer were harvested within the Project area. Fish and marine invertebrates comprised 70 percent of per capita subsistence harvest in Saxman in 1999.

52. The South Revilla Project area's nearby communities also depend on the forest for the economic benefits of the fast-growing tourism industry and for recreation opportunities.

53. In Ketchikan, forestry and logging contributed a monthly average of only 31 jobs in 2023. In 2025, the Alaska Department of Labor did not even report how many logging-related jobs there were in Ketchikan. Meanwhile, hospitality and sightseeing accounted for a monthly average of over 1,200 jobs in 2023 and 2025.

54. In 2025, Ketchikan welcomed 1.6 million visitors. This contributed to a quarterly average of 2,384 tourism-related jobs.

55. Within the Project Area, people—mostly locals—recreate by camping, hiking, hunting, fishing, beachcombing, relaxing outdoors, and boating. The area contains 13.7 miles of motorized trails used by off highway vehicles.

56. Recreationists use the Shoal Cove and Shelter Cove log transfer facilities for access. Due to the newly constructed Ketchikan Shelter Cove Road, recreational use of the Project area has increased.

**The Tongass Land Management Plan**

57. The Forest Service adopted TLMP to govern its management of the Tongass National Forest.

58. TLMP requires the Forest Service to manage for multiple uses, considering social, cultural, and economic issues in resource management.

59. TLMP seeks to produce desired resource values, products, services, and conditions in ways that also sustain the diversity and productivity of ecosystems, including viable populations of wildlife species, intact fish and wildlife habitat, outstanding scenery, and opportunities for recreation and subsistence.

60. TLMP seeks to maintain ecosystems capable of supporting the full range of native and desired nonnative species and ecological processes and a mix of habitats. To that end, the Forest Service is required to maintain the abundance and distribution of

habitats, especially old-growth forest, to sustain well-distributed, viable wildlife populations.

61. In planning and implementing projects and roads under TLMP, the Forest Service must consider wildlife habitat, give special emphasis to maintaining fish and wildlife habitat, and minimize impacts to soil, water, and wetlands.

62. TLMP seeks to provide a diversity of opportunities for resource uses that contribute to the local and regional economies of Southeast Alaska.

63. While TLMP allows continued logging, one of its goals is that timber should be managed in an economically efficient manner and projects be designed in a way that meets ecological, social, and economic needs.

64. Where logging is permitted, the Forest Service may authorize clearcutting only when it is essential to meeting TLMP's objectives.

65. The Forest Service must ensure that it provides a broad spectrum of outdoor recreation opportunities. Recreation projects should be developed in coordination with other resources, such as wildlife.

66. TLMP seeks to provide Forest visitors with visually appealing scenery, with an emphasis on areas seen from travel routes, including waterways, roads, and recreation places, although other areas may be visibly altered by timber harvest.

67. Use of forest lands must cause the least adverse impact possible to subsistence users. TLMP requires that subsistence resources be protected to ensure

residents can continue subsistence practices. TLMP seeks to maintain habitat capability sufficient to produce wildlife populations that support the use of wildlife resources for sport, subsistence, and recreational activities.

68. Proposed actions, such as integrated resource projects and timber sales, must be identified, evaluated, and implemented in a manner consistent with TLMP.

## The South Revilla Project

### *Administrative Process*

69. The DEIS for the South Revilla Project was issued in 2020.

70. Following a change in presidential administrations, the Project was placed on hold.

71. However, after the current administration took office, the Forest Service issued the FEIS and draft ROD for the Project in January 2026.

72. After publication of the FEIS and draft ROD, Plaintiffs and others submitted objections.

73. In response, the Forest Service concluded the FEIS and draft ROD were generally consistent with applicable law and policy, but the Acting Regional Forester directed staff to review information on the habitat conservation strategy and document if and how staff relied on the information or how the information would change the agency's conclusions before issuing a final ROD.

74. Subsequently, the final ROD was signed on July 29, 2026. The final ROD did not substantially change the Project.

### ***Project Components***

75. The Project has three stated purposes: 1) contribute to jobs and economic opportunities in local and regional communities through the management of timber, recreation, and aquatic and terrestrial resources, 2) sustain and improve aquatic and terrestrial habitat conditions that support the use of commercial, sport, and subsistence resources, and 3) provide access to forest resources for commercial, subsistence, and recreation users.

76. The FEIS states that the Project's objectives are to balance commercial and non-commercial opportunities and provide high-quality experiences for all forest users over the long-term, while maintaining or improving land and resource conditions. Further, the FEIS states that these objectives are consistent with TLMP's forest-wide multiple-use goals and objectives.

77. The Forest Service chose Alternative 2 as the Selected Alternative. Alternative 2 permits logging of up to 83 MMBF on 5,379 acres. Specifically, Alternative 2 authorizes harvest of 60 MMBF of old-growth trees from 4,343 acres and 23 MMBF of young-growth trees from 1,037 acres. This includes 3,696 acres of clearcut logging.

78. Alternative 2 allows construction of 11.1 miles of new roads and 30.9 miles of temporary roads, all to access tree stands for logging. Only 1.7 miles of new road would remain open for public use after logging concludes. Another 31.9 miles of existing closed roads would be maintained and opened for logging activities then reclosed

once logging is completed. These roads would require 93 stream crossings, 24 of which are on fish streams.

79. Additionally, the Project authorizes reconstruction and maintenance of the Shoal Cove and Shelter Cover log transfer facilities. The facilities will allow the movement of logged trees from trucks to log rafts or barges for shipment to sawmills, and result in the discharge of bark and wood debris into the surrounding water.

80. The Project also involves restoration efforts in the Licking Creek and Painted Creek watersheds, and development of recreation facilities in the Shelter Cove area, including a cabin, connector trails, dispersed camp sites, and trail improvements.

81. Alternative 2 includes a Project-specific TLMP amendment. The amendment will reduce the scenic integrity from moderate to very low in 13 old-growth units. This allows for clearcut logging and larger openings that will be visible from the visual priority travel routes adjacent to Shelter Cove Road, the Saddle Lakes Recreation Area, and the Carroll Inlet Area.

82. In total, 89 percent of the Project area would be managed for low and very low scenic integrity, creating a landscape visually dominated by clearcut logging.

83. The intent of the amendment is to increase the volume of logged trees in the Project area and permit more cost-effective logging methods to improve the economics of timber sales.

### *The Project's Environmental Effects*

84. The FEIS found that the Project would have negative impacts on subsistence, wildlife, old-growth habitat, and other resources.

85. The Project would authorize the destruction of over 4,300 acres of old-growth forest.

86. The FEIS noted that the Project may adversely affect individual Queen Charlotte goshawks. Logging harms goshawks by removing suitable nesting trees and decreasing foraging habitat quality by creating large openings devoid of prey. As clearcuts mature into young-growth stands, habitat quality does not improve because young growth stands are too dense for goshawks to fly through.

87. Additionally, the Project would reduce Sitka black-tailed deer high value winter habitat in the Project area by 44 percent. Old-growth logging destroys and fragments deer habitat, and effects could be felt for up to 150 years. Much of the Project area is already below TLMP's deer density objective, and the Project will only further impede that objective.

88. As a result, the Forest Service determined that the South Revilla Project may significantly restrict subsistence hunting of deer due to changes in abundance, access, and competition.

89. Specifically, decreased deer habitat capability and abundance will likely cause significant harm to subsistence use. Additionally, the Ketchikan-Shelter Cove

Road has already increased access for hunters. All of these pressures will increase competition for subsistence users.

90. The Forest Service found that the Project may adversely affect both freshwater and marine essential fish habitat, even though the Forest Service lacks streamflow and water quality data for the Project area's watershed. Logging is likely to increase stream flow and sedimentation while the log transfer facilities are likely to increase bark accumulation, sedimentation, and pollution in the Project area's marine environment. Bark accumulation buries benthic organisms, reduces organism abundance and diversity, and may create a toxic or anoxic environment, which harms aquatic species, including anadromous fish. Road building will increase sedimentation, turbidity, and stream flow, and stream crossings can inhibit fish passage.

91. These aquatic effects degrade water quality and fish habitat, and produce negative outcomes for spawning salmon, egg incubation, and juvenile salmonids.

92. The Project's logging, road construction, and log transfer facility reconstruction will disrupt the area's existing recreation opportunities. Clearcut logging as permitted by the Project's TLMP amendment will degrade scenic values near recreation areas. Noise, dust, and traffic from the construction of new and temporary roads will disturb visitors. Roads currently available for off-road vehicles will be opened to log-hauling and closed for public use during logging activities. The log transfer facilities, currently used as docks for recreationists, will be used for log transfer,

interfering with recreational uses. Additionally, boaters in Caroll Inlet will experience increased marine traffic and wakes from barges and log rafts.

93. Additionally, the Project will exacerbate climate change by emitting greenhouse gases and releasing carbon stored in the trees. Logging 5,379 acres is expected to cause an immediate loss of 309,789 metric tons of forest carbon stocks under the Selected Alternative. Once lost, it takes hundreds to thousands of years to reaccumulate the carbon in trees and soils to their ecological potential.

***The Forest Service's Flawed Rationale***

94. Despite all these harms logging and road building would cause to subsistence, wildlife, recreation, and other forest values, the Forest Service selected the alternative with the greatest harms to subsistence, wildlife, recreation, and scenery, that authorized logging of approximately 21 percent of the existing productive old-growth forest in the Project area.

95. The Forest Service authorized the Project because it concluded that the Selected Alternative would provide the best opportunity for creating economic benefits, including logging jobs.

96. Specifically, the Forest Service reasoned that the Selected Alternative best meets the need of offering timber sales to contribute to the economic sustainability of Southeast Alaska because it includes the highest volume of old-growth and young-growth timber and is expected to provide the most opportunities to support local and regional logging industry jobs.

97. The Forest Service stated that the Selected Alternative is expected to provide the most opportunity and flexibility for offering positive-value timber sales of varying sizes and a range of market conditions.

98. The Forest Service rejected other alternatives because it concluded they would not do as much as the Selected Alternative to meet the purpose and need of the Project to provide economic benefits, such as jobs.

99. The FEIS's analysis of the Selected Alternative, including logging costs, jobs estimates, and economic benefits, assumes that all 83 MMBF authorized by the Project would be logged.

100. The Forest Service provided estimates based on an export-heavy scenario, a low market condition where almost all manufacturing would occur outside Alaska, and a maximum Alaska manufacturing scenario, a high market condition where manufacturing in Alaska is encouraged.

101. The agency estimated that the Selected Alternative would create 364 logging-related jobs under the high market scenario and 315 logging-related jobs under the low market scenario.

102. The FEIS did not offer estimates for jobs in other economic sectors and industries.

103. However, these estimates do not reflect a realistic scenario because the record demonstrates that the Forest Service is unlikely to be able to offer the entire authorized amount of logging.

104. Federal law prohibits the Forest Service from advertising a timber sale in Alaska if the sale appraises negatively. Commerce, Justice, Science; Energy and Water Development; And Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, § 431, 140 Stat 5, 168 (2026) ("2026 Appropriations Act").

105. Specifically, the 2026 Appropriations Act states, "No timber sale in [the Tongass National Forest] shall be advertised if the indicated rate is deficit (defined as the value of the timber is not sufficient to cover all logging and stumpage costs and provide a normal profit and risk allowance under the Forest Service's appraisal process) when appraised using a residual value appraisal." *Id.*

106. The Forest Service acknowledges that it is only able to offer sales that appraise positively.

107. Notably, the Forest Service previously abandoned the 2015 Saddle Lakes project, a timber sale proposal in the same area, because the project resulted in a financially deficit appraisal.

108. For the South Revilla Project, the Forest Service completed a financial efficiency analysis intended to parallel the agency's timber sale appraisal process. This analysis showed an overall deficit for logging the whole Project volume of 83 MMBF.

The agency has not explained what conditions would need to change or what measures it could take to be able to offer the whole Project volume. The measures it has cited are not quantified and, in any event, would only affect costs for some undisclosed subset of units.

109. Specifically, the Forest Service used its Financial Analysis Spreadsheet Tool–Residual Value (FASTR) to conduct this analysis and compare each alternative's estimated timber advertised rate, using estimated logging and manufacturing costs depending on the type of logging system (e.g., shovel and cable or helicopter), timber values, and harvest volumes.

110. Additionally, because FASTR is based on an estimated volume per acre by logging system, the actual timber sales will likely have considerably fewer acres and less logging volume than analyzed in the FEIS, regardless of whether FASTR's estimated advertised rate is positive or negative.

111. The Forest Service stated it will determine the quantity, quality, and value of timber at the time of Project implementation.

112. The Forest Service provided FASTR results for the action alternatives in the 2020 DEIS. All action alternatives appraised negatively.

113. The Forest Service updated the FASTR results in January 2026, using the latest version of the tool. Again, all action alternatives appraised negatively. In fact, all action alternatives except Alternative 3 appraised more negatively than in 2020.

114. The Selected Alternative appraised the most negatively. Specifically, the FEIS projects that the advertised rate would range from negative $82.18 to negative $266.88 per thousand board feet, under the low market scenario and the high market scenario, respectively.

115. The Forest Service did not analyze in the FEIS or ROD any positively appraised timber sales that it could lawfully advertise.

116. Thus, the Forest Service likely cannot offer the whole Project, including all the authorized logging and road construction, as described in the FEIS under any of the action alternatives, including the Selected Alternative.

117. Nonetheless, the Forest Service asserts it will be able to offer positively appraised timber sales during Project implementation.

118. The Forest Service offered a list of variables that could potentially allow for positive sale appraisal: sale configuration, road design adjustments, and updated market data at the time of timber sale preparation. Similarly, in the FEIS, the Forest Service stated the Project could allow for efficiencies, such as reusing bridges or using the Forest Service's limited inventory of prefabricated bridges, to reduce Project costs. Lastly, the Forest Service asserts that the TLMP amendment allowing degraded scenery in certain areas reduces costs for the associated units by as much as $100 per thousand board feet. At most, this amendment would only affect 408 acres in 13 of the 170 units authorized under the Project.

119. The Forest Service has not explained how these variables, individually or cumulatively, would allow the agency to offer 83 MMBF of timber for sale.

120. The Forest Service did not offer analysis to demonstrate how these variables could change the Project's estimated advertised rate or how much timber it could expect to offer if relying on these variables.

121. The Forest Service did not analyze how the choices it makes to achieve positively appraising timber sales will affect the Tongass's other uses, such as subsistence, habitat, recreation, and scenery.

122. For instance, the Forest Service does not discuss the possibility of only being able to offer a portion of the Project, such as a sale with less than all the timber authorized, or to what extent smaller offerings would affect environmental, subsistence, economic, or social impacts or benefits.

123. Specifically, the Forest Service does not discuss whether subsistence or environmental harms from logging would be reduced in direct proportion to reduced timber harvest amounts.

124. For example, the Forest Service does not explain whether areas that are most likely to generate positively appraising sales overlap with areas that are critical to subsistence uses or that are particularly important ecological areas, such as old-growth forest and wildlife corridors.

125. Instead, the Forest Service has deferred making choices about timber sales to the implementation stage, stating it is important to have flexibility to configure sales to result in positive appraisals.

126. However, the Forest Service has not indicated that it will conduct any additional public process, subsistence findings, or other publicly available analysis of the Project or its effects prior to offering timber sales.

127. The FEIS is the applicable NEPA document for future timber sales implementing the South Revilla Project. In the past, the Forest Service has not provided additional NEPA process or subsistence findings for individual timber sales that implement an integrated resource project analyzed in an EIS.

128. The Forest Service concluded that the Selected Alternative complies with NFMA because it provides a balanced approach to providing a sustainable level of forest products to contribute to the economic sustainability of Southeast Alaska.

129. Specifically, the Forest Service explained that its FEIS analysis of the whole Project considered forest ecosystem health, economic development opportunities, subsistence resources, water quality and fish habitat, and wildlife habitat and connectivity.

130. In the FEIS, the Forest Service claimed that timber supply is influenced by TLMP's direction for other resources, including soils, watershed and aquatics, wildlife habitat, sensitive and rare plants, and scenery.

131. Further, the Forest Service concluded that the Selected Alternative, assuming 83 MMBF would be logged, is consistent with TLMP's multiple-use direction and moves the Project area toward TLMP's desired forest conditions overall.

132. The Forest Service acknowledged that adopting the Selected Alternative with the TLMP amendment to the scenic integrity objectives for 13 units involved negative effects to scenery that represent a tradeoff for multiple-use management.

133. The Forest Service justified this tradeoff by emphasizing its focus on maximizing timber production to contribute to Southeast Alaska's economy. The Forest Service stated it understood the impacts to scenery and forest visitors but, nonetheless, found that adoption of the TLMP amendment achieves the best balance for multiple-use management.

134. The Forest Service stated it would ensure multiple use of all renewable forest resources, with respect to the whole Project, during implementation, although the FEIS showed that the Project would impair subsistence, habitat, fish and wildlife, water quality, and scenery without providing economical timber sales.

135. Additionally, the Forest Service concluded that the Project would significantly restrict subsistence deer hunting, even while acknowledging it lacked current subsistence use information.

136. The Forest Service determined that the Selected Alternative is a necessary restriction on subsistence because the Selected Alternative strikes a balance between meeting resource needs and protecting forest resources.

137. The Forest Service also determined that the Selected Alternative will involve the minimal amount of public lands necessary to accomplish the Project's purpose because the agency concluded that it was impossible to authorize logging and road construction avoiding subsistence use areas, and that attempting to reduce effects in some areas may increase effects in other areas.

138. Despite the harmful effects to habitat and wildlife caused by authorizing logging of 83 MMBF, the Forest Service determined that fish and wildlife habitat productivity will be maintained, consistent with the overall multiple-use goals and protections of TLMP.

139. Although the FEIS showed that the monetary costs of logging all 83 MMBF outweighed the value of the timber, the Forest Service explained that it had focused on offering the maximum amount of logging, even when its analysis demonstrated that logging all 83 MMBF would harm subsistence, wildlife, scenery, recreation, and other forest resources.

140. The Forest Service stated that implementation of the South Revilla Project may begin immediately.

### *Inadequate Protections for Goshawks*

141. The Forest Service has identified the Queen Charlotte goshawk as a sensitive species that is susceptible or vulnerable to habitat alterations or management activities resulting in a viability concern for long-term persistence of the species, and that needs special consideration to ensure viable populations on the Tongass.

142. To meet NFMA's requirements for plant and animal diversity, and to provide enough habitat to ensure viable populations and adequate distribution of old-growth dependent wildlife on the Tongass, the Forest Service employs the Conservation Strategy developed in the 1990s.

143. The Conservation Strategy was incorporated in the 1997 TLMP and has been retained with minor modifications ever since. The current version of TLMP, adopted in 2016, still relies on the Conservation Strategy to meet NFMA's wildlife diversity requirements.

144. The Conservation Strategy protects old-growth associated wildlife through a combination of 1) a system of old-growth habitat reserves, where logging may not occur; 2) forest-wide standards and guidelines that, among other things, place some limits on logging outside the reserves; and 3) species-specific standards and guidelines that may further limit logging and other development activities outside the reserves.

145. The interagency team of biologists that developed the Conservation Strategy recommended species-specific standards and guidelines for goshawks restricting logging within a core area of about 1,600 acres and roads and recreational development

within 126 acres (or one-quarter mile) of each goshawk nest, and logging to no more than 5 percent of productive old growth per decade in the remainder of the home range outside the core area.

146. Instead, the Forest Service adopted weaker goshawk standards and guidelines. In areas where logging is otherwise allowed, TLMP requires the Forest Service to maintain at least a 100-acre buffer of productive old-growth forest (or if productive old-growth is not available, the largest diameter young-growth forest) around confirmed and probable goshawk nests in which no commercial logging can occur. Within the nest buffer and in the 600 feet surrounding the nest, new road construction and other disturbances are limited.

147. In 2007, the U.S. Fish & Wildlife Service (FWS) determined the Alaska population of the Queen Charlotte goshawk did not warrant listing as threatened or endangered under the Endangered Species Act, despite finding that the Vancouver Island population in Canada warranted listing. In explaining its decision not to list the Alaska population, FWS cited the TLMP Conservation Strategy. FWS stated that while nest buffers larger than 100 acres would likely enhance goshawk conservation by providing better habitat for fledglings, the agency did not expect the lack of larger buffers to reduce fecundity or survival to an unsustainable level because the Conservation Strategy would retain old-growth reserves and other intact forest patches outside the reserves for nesting. FWS evaluated whether the Queen Charlotte goshawk was at risk of extinction in

Southeast Alaska. It did not consider whether the goshawk was well-distributed throughout the Tongass.

148. When the Forest Service amended TLMP in 2008, FWS recommended the Forest Service increase goshawk nest buffers from 100 acres to 500 acres to protect nest sites and post-fledging habitat from logging. The Forest Service declined, reasoning that FWS's decision to not list the Alaska goshawk population suggested that increased nest buffers were not essential and that the Conservation Strategy as a whole (not only the species-specific guidelines) provides adequate habitat for nesting and fledging goshawks.

149. In 2013, biologist Winston Smith published a study testing this claim (Smith 2013). Smith mapped all the various Conservation Strategy protections around 136 known nest trees to determine how much of the average goshawk post-fledging area and average female breeding range is secured, i.e., protected from development, by the Conservation Strategy. The results showed that the Conservation Strategy secures only about half of the recommended habitat for post-fledging areas. In more than 30 percent of the nest areas, logging is permitted within the vast majority (91 percent) of the post-fledging area. Smith's study highlighted the uncertainty that the Conservation Strategy sufficiently protected goshawk nesting and post-fledging habitat.

150. When the Forest Service amended TLMP in 2016, commenters and FWS urged the Forest Service to update standards for managing goshawk nesting habitat. Specifically, FWS recommended the Forest Service prevent large forest openings in a

500-acre post-fledging area around known or suspected nests. The Forest Service acknowledged that nest trees should be surrounded by patches of mature or old-growth forest large enough to include alternate nests and post-fledging habitat. It also acknowledged that the Smith 2013 study suggests it is uncertain that the Conservation Strategy protects sufficient habitat to sustain well-distributed, viable populations of goshawks throughout Southeast Alaska. However, the Forest Service did not update the goshawk standards and guidelines at that time, taking the position that it was outside the scope of what the Forest Service intended to be a focused plan amendment.

151. Land management plans like TLMP require periodic revision. In anticipation of the next TLMP revision process, the Forest Service recently convened a team of both Forest Service and FWS staff to review the Conservation Strategy for potential updates. The review team published its findings in 2024. The review team expressed that insufficient protection of post-fledging habitat around nests is a shortcoming of the TLMP Conservation Strategy, citing Smith 2013 and recommendations from many goshawk scientists. The review team recommended the Forest Service develop guidelines to address this shortcoming. Although the review team stated the Conservation Strategy appears to protect vulnerable species, it acknowledged the Forest Service lacks population monitoring data for most species except wolves on Prince of Wales Island.

152. Additionally, the Forest Service has begun to review its list of species of conservation concern for the Tongass. In that context, in June 2025, the agency determined that threats to the Queen Charlotte goshawk may be substantial.

153. The Forest Service does not know how many goshawks currently remain on the Tongass. It does not know whether localized extirpations have occurred, or how many may have occurred.

154. In its 2007 listing decision, FWS estimated there could be 261 to 336 breeding pairs of goshawks on the Tongass. That is the most recent population estimate available.

155. Multiple goshawks have been detected in the Project area. The Forest Service identified one nest area near Saddle Lakes in 2025. It previously located a nest in the southeast portion of the Project area in 2002.

156. The FEIS acknowledges Smith's 2013 analysis suggests there is uncertainty regarding whether the Conservation Strategy protects sufficient habitat to sustain viable populations of goshawks throughout the Tongass.

157. The FEIS acknowledges fragmentation and impacts on nesting habitat in the Project area could be affecting goshawk use of the area and limiting nesting.

158. The FEIS acknowledges the Project will cause all value comparison units in the Project area to either meet, exceed, or further exceed the threshold at which the loss of productive old growth creates an increased risk of not supporting goshawks.

159. The Project includes both clearcut and uneven-aged logging near goshawk nests and potential goshawk nests, including inside and immediately adjacent to an existing nest buffer.

160. The FEIS nonetheless finds the Project may adversely impact individual goshawks but is not likely to cause a trend to federal listing or a loss of viability in the Project area.

161. In their objection, Plaintiffs urged the Forest Service to implement additional measures in the Project to ensure sufficient goshawk protection, including buffers that comply with the standards recommended by goshawk specialists for fledging and breeding habitat.

162. Although the Acting Regional Forester found the draft ROD approving the Project was lawful, he directed the responsible official to review the information the Conservation Strategy review team relied upon and document whether this information alters the conclusions in the FEIS and ROD. The Acting Regional Forester noted that considering, in particular, the information about the Queen Charlotte goshawk would inform the analysis in the FEIS.

163. In the final ROD, the Acting Forest Supervisor stated the Conservation Strategy review and the information it relies upon did not change the analysis or conclusions in the FEIS. She acknowledged that larger buffers for goshawks could strengthen existing TLMP standards and guidelines but concluded that the Conservation

Strategy adequately mitigates threats to the species, citing the Conservation Strategy review and FWS's 2007 listing decision. She did not address the fact that the Conservation Strategy review team identified insufficient conservation of goshawk habitat as a shortcoming of the strategy, or that population monitoring data is lacking. She did not address Smith's 2013 analysis mapping Conservation Strategy components against known goshawk nest sites, showing that those components do not provide enough habitat protection to satisfy goshawks' biological requirements. She did not address the Conservation Strategy review team's finding that the 100-acre nest buffer TLMP requires is well below standards recommended by goshawk specialists.

**COUNT I**

**Violation of NFMA, MUSYA, and APA**

164. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 163.

165. Congress originally established the National Forest System "to improve and protect [forests or] secur[e] favorable conditions of water flows, and to furnish a continuous supply of timber." 16 U.S.C. § 475.

166. In MUSYA, Congress broadened these purposes to include "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.

167. To that end, MUSYA directs the Secretary of Agriculture to "develop and administer the renewable surface resources of the national forests for multiple use and

sustained yield," giving "due consideration" to the "relative values of the various resources in particular areas." *Id.* § 529.

168. Multiple use is the "management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people." *Id.* § 531(a).

169. NFMA sets forth the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands.

170. Under NFMA, forest management occurs at two stages. At the first stage, the Forest Service prepares a land management plan for each national forest. 16 U.S.C. § 1604.

171. Land management plans must be based on, among other things, "consideration of the economic and environmental aspects of various systems of renewable resource management," "provide for diversity of plant and animal communities," and ensure that trees are only harvested if certain environmental standards are met. *Id.* § 1604(g)(3).

172. At the second stage, the Forest Service implements each land management plan by approving specific projects that are consistent with the governing forest plan and the Forest Service's multiple use management obligations. *Id*. §§ 529, 1604(i) 1607.

173. The land management plan for the Tongass is TLMP. Therefore, the Project purportedly implements TLMP.

174. When authorizing the South Revilla Project, the Forest Service was required to comply with NFMA, MUSYA, and TLMP.

175. The Forest Service concluded that the Project as analyzed in the FEIS and ROD satisfies its stated purposes, complies with TLMP, and best balances multiple uses.

176. However, the Forest Service is unlikely to implement the whole Project as described in the FEIS and ROD because the agency's analysis demonstrates that offering the entire Project would result in negatively appraised timber sales, which is barred under the 2026 Appropriations Act and TLMP.

177. Instead, the Forest Service states that timber sales will be configured during implementation to result in a positive appraisal, but the agency has not identified such sale configurations nor the effects of these sales on "the relative values of the various resources in particular areas." 16 U.S.C. § 529.

178. Without such analysis, the Forest Service cannot rationally determine that the Selected Alternative satisfies the Project's purpose to contribute jobs and economic opportunities to the region, offers economically efficient timber, and appropriately balances the forest's multiple uses. *Id.* § 531(a).

179. Thus, the record does not support the Forest Service's conclusion that the Project satisfies its stated purposes, complies with TLMP, and best balances multiple uses.

180. The Forest Service has failed to conduct a rational balancing of multiple uses in violation of NFMA, MUSYA, and TLMP. *Id.*

181. As a result, the FEIS and ROD are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); 16 U.S.C. §§ 529, 1604(i), 1607.

**COUNT II**

**Violation of ANILCA and APA**

182. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 181.

183. When enacting ANILCA, Congress found that the "the continuation of the opportunity for subsistence uses by rural residents of Alaska" was "essential" to the physical, economic, traditional, cultural, and social existence of those residents. 16 U.S.C. § 3111(1).

184. Further, Congress understood that "the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life" required "enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." *Id.* § 3111(5).

185. Congress resolved to "protect and provide the opportunity for continued subsistence uses" on public lands. *Id.* § 3111(4).

186. Congress thus declared a national policy that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." *Id.* § 3112(1).

187. To that end, ANILCA section 810 mandates that when a federal agency is considering whether to "withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition" of public lands, the agency must evaluate the effects of that action on subsistence uses and needs. *Id.* § 3120(a).

188. The agency must also consider the availability of other lands and other alternatives to reduce or eliminate public land used for subsistence from the action. *Id.*

189. The agency must also determine whether the action may significantly restrict subsistence uses. *Id.*

190. If the action may restrict subsistence uses, the agency cannot proceed with the action unless the agency determines that (1) "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands" and (2) "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purpose" of the action. *Id.* § 3120(a)(3)(A)-(B).

191. The Forest Service concluded that the Selected Alternative may significantly restrict subsistence hunting of deer due to changes in abundance, access, and competition.

192. First, the Forest Service determined that the Selected Alternative, which authorizes the sale of 83 MMBF of timber in the Project area, is necessary and consistent with sound management of public lands, because the Selected Alternative strikes a balance between meeting the resource needs of the public and protecting forest resources.

193. The Forest Service violated ANILCA with respect to this necessity finding because it is based on the FEIS's analysis of the whole Project (i.e., logging 83 MMBF in the Project area.) But the FEIS demonstrates the Forest Service is unlikely to implement the whole Project because selling all the timber in the Project area would appraise negatively, and negatively appraised timber sales are prohibited by the 2026 Appropriations Act and TLMP.

194. The Forest Service has not analyzed whether a different project—one that appraises positively and could, therefore, be lawfully advertised—is necessary.

195. The Forest Service cannot rationally determine that a project's restriction on subsistence is necessary without analyzing the project it will actually offer for sale. Further, Forest Service's determination that the Selected Alternative's significant restriction of subsistence uses is necessary is not supported by the agency's analysis and not in accordance with the law, rendering this determination arbitrary and capricious.

196. Second, the Forest Service determined that the amount of land necessary to implement the Selected Alternative is the minimum necessary to accomplish the purposes of the South Revilla Project because it concluded it was impossible to avoid subsistence

areas in authorizing logging and road construction, and attempting to reduce effects may increase the effects elsewhere.

197. This minimum land determination similarly violates ANILCA. The Forest Service determined that the Selected Alternative used the minimum amount of public land necessary to accomplish the Project's purpose, but its analysis shows that it likely cannot complete the entire Project because that would result in a negative-appraising timber sale, which it cannot lawfully offer. Thus, the FEIS approved an action that likely involves more public land than is actually needed to accomplish the Project's purpose. *Id.* § 3120(a)(3)(B).

198. The Forest Service acknowledges that it will later configure positive-appraising sales, but it has not analyzed those sales nor considered whether the Project could meet its purposes with a smaller amount of land that could avoid important subsistence use areas to minimize the impact of the logging on subsistence uses.

199. Because the Forest Service has failed to analyze realistic and permissible sale configurations, including those potentially involving less public land, its determination that the Project involves the minimum amount of public lands necessary to accomplish the Project's purpose is not supported by the record and not in accordance with law. Therefore, the Forest Service's determination is arbitrary and capricious.

200. The Forest Service's determinations that (1) the Project is necessary, consistent with sound management principles for the utilization of public lands, and (2)

involves the minimal amount of land necessary to accomplish the Project's purpose are arbitrary and capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law. *Id.*; 5 U.S.C. § 706(2)(A), (D).

**COUNT III**

**Violation of NFMA and APA**

201. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 200.

202. When authorizing the South Revilla Project, the Forest Service was required to comply with NFMA and TLMP. *See* 16 U.S.C. §1604(i).

203. NFMA requires that land management plans "provide for diversity of plant and animal communities." *Id.* § 1604(g)(3)(B).

204. TLMP incorporates this requirement by directing the Forest Service to provide the abundance and distribution of habitat necessary to maintain well-distributed, viable populations of existing native species in the forest.

205. The Forest Service concluded the Project complies with TLMP's requirement to provide the abundance and distribution of habitat necessary to maintain well-distributed, viable populations of Queen Charlotte goshawks because of the Conservation Strategy.

206. This conclusion was arbitrary because the best available science, including the Conservation Strategy review team's recent assessment, demonstrates that the Conservation Strategy does not meet Queen Charlotte goshawks' biological

requirements. The Forest Service's assertion that the Conservation Strategy is nonetheless adequate to protect a viable, well-distributed goshawk population fails to grapple with that science, ignores important aspects of the problem, and is contrary to the record. The Forest Service did not demonstrate that it examined the relevant data and did not articulate a satisfactory explanation for its action.

207. As a result, the FEIS and ROD are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1604(e), (g)(3)(B).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Declare that the Defendants violated NFMA, MUSYA, and the APA, and that the actions as set forth above are arbitrary and capricious, an abuse of discretion, and not in accordance with law;

2. Declare that the Defendants violated ANILCA and the APA, and that the actions as set forth above are arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

3. Declare that the Defendants have acted inconsistent with TLMP and in violation of NFMA and the APA, and that the actions as set forth above are arbitrary and capricious, an abuse of discretion, and not in accordance with the law;

4. Vacate the South Revilla FEIS and ROD, or those portions deemed not in compliance with the law, and any actions taken by Defendants in reliance on either document as void;

5. Enter preliminary and permanent injunctive relief as needed to prevent irreparable harm from implementation of the South Revilla Project, and rescind any actions taken by Defendants in reliance on the FEIS and ROD;

6. Award Plaintiffs the costs, fees, and other expenses of this action, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

7. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 27th day of August, 2026.

s/ *Olivia Glasscock*
Olivia Glasscock (Alaska Bar No. 1809072)
EARTHJUSTICE

s/ *Katharine S. Glover*
Katharine S. Glover (Alaska Bar No. 0606033)
EARTHJUSTICE

s/ *Ashley Donovan*
Ashley Donovan (Alaska Bar No. 2404031)
EARTHJUSTICE

*Attorneys for Ketchikan Indian Community, Center for Biological Diversity, and Southeast Alaska Conservation Council.*